**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|   |   |   |
|---|---|---|
| | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | **CRIM. No. 3:16-CR-178 (VLB)** |
| | : | |
| **v.** | : | |
| | : | **July 30, 2019** |
| **JAMES ERIK GODIKSEN,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTIONS FOR ACQUITTAL AND NEW TRIAL PURSUANT TO RULES 29 AND 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE [ECF Nos. 151, 152]

Before the Court are Defendant James Erik Godiksen's ("Defendant" or "Godiksen") motion for acquittal and motion for a new trial under Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure. Defendant was tried and convicted by a jury on one count of murder for hire in violation of 18 U.S.C. § 1958. Godiksen now requests that the Court set aside the jury's verdict and grant his motion for acquittal, or in the alternative grant his motion for a new trial. For the following reasons, these motions are DENIED.

## I.    Background

The court views the evidence in the light most favorable to the Government when considering a motion for acquittal brought under Rule 29. *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015). On September 29, 2016, a grand jury returned an indictment charging the defendant with one count of murder for hire in violation of 18 U.S.C. § 1958. [ECF No. 9 (Indictment)]. The indictment was based

on the results of a murder for hire investigation undertaken by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), which took place from September 9 to 14, 2016. *Id.* at 1. Godiksen was the object of that investigation. *Id.*

Just prior to the ATF's investigation, Godiksen had served a thirty-day sentence at the New Haven Correctional Center ("NHCC"). [ECF No. 147 (Godiksen Trial Tr. Day 3) at 182:22-183:4, 193:7-12]. Testimony at trial indicated that Godiksen discussed killing his ex-wife with an inmate named 'Josh', while serving his sentence at NHCC. [ECF No. 144 (Godiksen Trial Tr. Day 1) at 37:4-7, 55:12-23, 62:9-13]; [ECF No. 147 at 191:14-24]. Josh reported to then-Intelligence Lieutenant Craig Burnett that Godiksen was actively searching for someone in the corrections facility to help him have his ex-wife murdered. [ECF No. 144 at 37:4-7, 55:12-23, 62:9-13]; [ECF No. 147 at 191:14-24]. Lieutenant Burnett passed this information along to ATF. [ECF No. 144 at 30:5-17]. ATF began its investigation soon after being notified about Godiksen's alleged conduct. Special Agent Paul D'Angelo ("D'Angelo") stationed in Manchester, New Hampshire contacted Godiksen via cellular phone from Salem, New Hampshire in order to install himself as the proposed hitman in Godiksen's murder for hire. [ECF No. 144 at 104:9-25]; *see also* Government Exhibit 24; Government Exhibit 25.

During their initial phone conversation on September 10, 2016, Godiksen confirmed his identity by stating that he was 'Fish'. *See* Government Exhibit 25. 'Fish' was the nickname given to Godiksen by inmates at NHCC, and the moniker Josh told the investigators to use when contacting Godiksen about the murder for

hire. [ECF No. 144 at 31:9-11; 51:14-19]. D'Angelo testified Godiksen was using coded language to discuss having his ex-wife murdered. [ECF No. 145 (Godiksen Trial Tr. Day 2) at 80:1-16]. Instead of discussing murder for hire directly, Godiksen told D'Angelo he was interested in having work done on his home. *See* Government Exhibit 25. The evidence showed that Godiksen was living out of motels, and therefore did not live in a home at the time of the phone call. [ECF No. 145 at 33:20-21]; Government Exhibit 25. Godiksen and D'Angelo had not discussed work on a home Godiksen's home previously. D'Angelo testified that he knew based on the context this was a code that Godiksen was using in order to avoid "us[ing] the word 'murder' or 'killing' or anything on a phone line, which would be common in these types of situations." [ECF No. 145 at 80: 8-12]. Godiksen stated several times that he would pay D'Angelo for the "work on his house." Government Exhibit 25. D'Angelo and Godiksen set up a meeting in Connecticut during the initial conversation. *See* Government Exhibit 25. After the conversation ended, D'Angelo left New Hampshire and traveled to Connecticut in order to meet with Godiksen. [ECF No. 144 at 109:16-22].

Once in Connecticut, D'Angelo and Godiksen met in person several times to iron out the details of their deal. In each of these accounts, Godiksen is recorded stating that he wanted his ex-wife to be murdered. *See* Government Exhibit 25, 26, 30. During the meetings, Godiksen provided information to D'Angelo regarding his ex-wife's home address, her place of work, her vehicle and license plate number, and her appearance. *See* Government Exhibit 26; *see also* [ECF No. 144 at 122:23-123:16], [ECF No. 145 at 23:13-24:1; 96:9-15].

Godiksen further described where he felt a suitable location might be to carry out the murder.  Government Exhibit 26; *see also* [ECF No. 145 at 99:25-100:13].  Godiksen was recorded suggesting that D'Angelo cut his ex-wife's head off and specifically asking that D'Angelo not harm Godiksen's ex-wife's dog.  Government Exhibit 26; *see also* [ECF No. 145 at 59:25-60:1].

Godiksen initially agreed to a $5000 price, explaining there would be a slight delay in accessing his funds.  S*ee* Government Exhibit 26. In a later conversation he offered his vehicle as payment.  Government Exhibit 30; *see also* [ECF No. 145 at 55:3-4].  During his final conversation with Godiksen on September 14, 2016, D'Angelo confirmed that Godiksen was hiring him to kill Godiksen's ex-wife.  D'Angelo  told Godiksen that when he left, he'd be going to kill Godiksen's ex-wife, he would be incommunicado  and Godiksen would not have a chance to back out of the arrangement.  Government Exhibit 30; *see also* [ECF No. 145 at 24:15-22].  Godiksen confirmed that he was hiring D'Angelo to kill his ex-wife responding, that he wanted the murder to take place and requested a promise from D'Angelo that the murder be carried out.  Government Exhibit 30; *see also* [ECF No. 145 at 74:14-15]. Godiksen then promised one final time to pay for the murder in cash.  *See* Government Exhibit 30; *see also* [ECF No. 145 at 71:22-72:3].  Godiksen was arrested moments later.

II.   Procedural History

At trial, which ran for six days between July 10 and 19, 2018, the jury returned a verdict stating that Godiksen (1) used a facility of interstate commerce, while at the same time having (2) the intent that his ex-wife be murdered, and (3) that

Godiksen made an agreement to pay for the murder. [ECF No. 133 (Jury Verdict) at 1-2]. Following the guilty verdict, on August 3, 2018, the defendant was granted a Motion to Continue for his Motions for Acquittal and for a New Trial, extending the deadline for those motions beyond the 14-day limit that Federal Rules of Criminal Procedure 29(c)(1) and 33(b)(2) set forth, until October 3, 2018. [ECF No. 137]. Defendant filed Motions for Acquittal and for a New Trial on October 3, 2018, [ECF Nos. 151, 152], which the Government opposed on October 24, 2018. [ECF No. 153].

## III.  Motion for Acquittal

Defendant argues that the evidence was insufficient to show beyond a reasonable doubt that he had the specific intent that his ex-wife be murdered when he spoke on the phone with D'Angelo, therefore the intent element of 18 U.S.C. § 1958 was not satisfied. *See* [ECF No. 151 (Defendant's Motion for Acquittal) at 1-2]. Defendant further argues that there was insufficient evidence to show that a pecuniary value had been settled upon; therefore, a rational jury could not find beyond a reasonable doubt that this element of 18 U.S.C. § 1958 had been satisfied. [ECF No. 151 at 2]. The evidence presented was sufficient that a rational jury could find all the elements of 18 U.S.C. § 1958 satisfied beyond a reasonable doubt.

### A.  Standard of Review; Motion for Acquittal

"On a defendant's postverdict motion, 'the court 'must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.'" *Cacace*, 796 F.3d at 191 (quoting Fed. R. Crim. P. 29(a)). "A defendant challenging the sufficiency of the evidence bears a heavy burden, because the

reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny,* 667 F.3d 122, 139 (2d Cir. 2011) (citation omitted). "The motion must be denied if, after viewing the evidence in the light most favorable to the prosecution, the court concludes that 'any rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt.'" *Cacace*, 796 F.3d at 191 (quoting *United States v. Moore*, 54 F.2d 92, 100 (2d Cir. 1995). "In addition, we consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence." *United States v. Lee*, 549 F.3d 84, 92 (2d Cir. 2008) (citation omitted; internal quotation marks omitted).

"[A] conviction may be based entirely on circumstantial evidence." *Id.* "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'" *United States v. Kim*, 435 F.3d 182, 184 (2d Cir. 2006) (quoting *United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995)). "[W]e may 'enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Francisco*, 642 F. App'x 40, 43 (2d Cir. 2016) (quoting *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006)). The jury's determination of guilt beyond reasonable doubt is to be accepted by the court, even in circumstances where the evidence may also have supported the jury *not* finding guilt beyond a reasonable doubt. *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) ("[W]here 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the

jury decide the matter.'" (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).

 

     **B.**     **Murder for Hire; 18 U.S.C. § 1958**

     An individual is guilty of murder for hire if the government proves beyond a reasonable doubt that the individual:

> travel[ed] in or cause[d] another (including the intended victim) to travel in interstate or foreign commerce, or use[d] or cause[d] another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspire[d] to do so.

18 U.S.C. § 1958(a). "When the defendant is the solicitor of the murder-for-hire, it is the defendant's intent that controls." *United States v. Hardwick*, 523 F.3d 94, 100 (2d Cir. 2008) (citation omitted). "The nature of the solicitor's intent is especially important when the would-be murderer is an undercover agent who by definition never intends to commit the crime." *Id.* (citation omitted). "[T]here must be some evidence to establish that at the time the agreement was formed, the consideration was something the 'primary significance' of which lay in its 'economic advantage.'" *United States v. Frampton*, 382 F.2d 213, 219 (2d Cir. 2004) (quoting 18 U.S.C. § 1958(b)(1)). "[T]here must be a quid-pro-quo (or at least the promise of such) between the parties to the transaction." *United States v. Babilonia*, 854 F.3d. 163, 174 (2d Cir. 2017) (citations omitted; internal quotation marks omitted).

     **C.**     **A Rational Jury Could Have Concluded that Godiksen Used or Caused Another to Use a Facility of Interstate Commerce**

The use of a cell phone to discuss a murder for hire with the proposed hitman satisfies the facility of interstate commerce requirement of 18 U.S.C. § 1958. *See United States v. Perez,* 414 F.3d 302, 305 (2d Cir. 2005); *see also United States v. Giordano*, 442 F.3d 30, 39 (2d Cir. 2006) ("the national telephone network is a 'facility of interstate . . . commerce' for purposes of the federal murder-for-hire statute.") (citations omitted); 18 U.S.C. § 1958(b)(2) ("'facility of interstate or foreign commerce' includes means of transportation and communication."). The parties stipulated to certain facts, including a cell-phone call between Connecticut and New Hampshire would use cell towers outside of Connecticut. *See generally* [ECF No. 106 (Stipulation)]. The jury heard a recorded telephone conversations between Godiksen, who was in Connecticut and D'Angelo, who at times was in Rhode Island at one time and in Connecticut at other times, during which Godiksen commissioned D'Angelo to commit the murder. Godiksen did not argue that he did not speak about murder for hire while on the phone with D'Angelo. Based on the above-mentioned definition of interstate commerce, a rational jury could have concluded beyond a reasonable doubt that Godiksen used or caused D'Angelo to use a facility of interstate commerce in pursuing murder for hire by conversing about the murder for hire with D'Angelo using his cell phone.

D.    **Godiksen Had the Requisite Intent to Satisfy 18 U.S.C. § 1958 When He Initially Spoke with D'Angelo Over the Phone**

1. *The Specific Intent Requirement of 18 U.S.C. § 1958.*

For a rational jury to find that the defendant had the requisite intent to commit murder for hire, the government must show that the defendant not only conversed about a murder for hire through a facility of interstate commerce, but

that "**the accused intended for a murder to be committed.**" *United States v.*
*Richeson*, **338 F.3d 653, 656 (7th Cir. 2003).** *See also Hardwick*, **523 F.3d at 100**
**(same).**

### 2. Godiksen Demonstrated His Intent to have His Ex-Wife Killed During the Initial Phone Call and in Later Face-to-Face Meetings.

D'Angelo testified that during their initial phone conversation Godiksen
spoke in code to him about killing Godiksen's ex-wife by saying he wanted work
done on his house.  D'Angelo knew this was code because they had never
discussed work on a house.  Further, the 'Josh' connection drastically narrowed
the possibilities down as to what the code meant, leading D'Angelo to infer that
Godiksen was talking about murder for hire.  Godiksen also did not own a home at
the time the conversation took place.  This evidence could lead a rational jury to
conclude that Godiksen had the intent that his ex-wife be murdered during the
initial phone conversation with D'Angelo.

 Circumstantial evidence from later encounters (still prior to Godiksen's
arrest) between D'Angelo and Godiksen could also lead a rational jury to conclude
beyond a reasonable doubt that Godiksen was not discussing work on his house
during that initial conversation and was instead communicating in code about a
murder for hire.  The evidence shows that over the course of the investigation,
Godiksen stated his desire to have his ex-wife murdered on several occasions.
Godiksen is recorded suggesting a method of killing his ex-wife and giving a

detailed description of her. Government Exhibit 26. He then described a secluded location that his ex-wife frequented, believing it to be an ideal place for D'Angelo to strike. *Id.*

In his final conversation pre-arrest with D'Angelo, Godiksen stated that he wanted his ex-wife to be murdered and added that he was ready to pay D'Angelo to do it. Government Exhibit 30. These statements indicate that Godiksen had the specific intent that his ex-wife be murdered throughout the ATF's investigation, and therefore a rational jury could find beyond a reasonable doubt that the defendant had the specific intent to have his ex-wife murdered during the initial phone call with D'Angelo.

### 3. Godiksen's Motive for Killing his Ex-wife Supports Finding Godiksen had the Requisite Specific Intent

The Government argues that Godiksen's reason for seeking murder for hire against his ex-wife was that she took everything from him in their divorce, and therefore ruined his life. [ECF No. 153 at 10]; *see also* Government Exhibit 26 ("She took my house, my dog, my Corvette. She took everything."). Godiksen argues that he did not have motive to kill his ex-wife because she did not take everything from him in the divorce as the government contends, and as he stated following his arrest. Godiksen argues that although he previously stated that his ex-wife took everything from him, *see* Government Exhibit 26, the reality was that he retained the rights to several items, including his retirement account and his Corvette. [ECF No. 151 (Defendant's Motion for Acquittal) at 19]. Therefore, according to the defendant, the motive that the Government is citing to support Godiksen's specific intent to have his ex-wife murdered does not exist. Neither

characterization of the events is entirely accurate, but what matters is what Godiksen believed the situation was.

A rational jury could find that based on the circumstance, Godiksen's stated belief that his ex-wife had taken everything from him in the divorce represented his true belief, and that he therefore had motive to have her killed. The assertion that Godiksen lost everything in the divorce is not an entirely accurate portrayal of the terms of Godiksen's divorce from his ex-wife and the circumstance that resulted from it. The defendant had ownership rights of certain pieces of property following the divorce but did not retain actual possession of said property. For example, the defendant retained the rights to his Corvette after the divorce, but it was located at his ex-wife's home. [ECF No. 145 at 95:4-6]. The defendant was unable to retrieve the Corvette because he was not allowed on his ex-wife's property due to a protection order. *See id.* at 93:2-7, 94:8-15. Therefore, although Godiksen did have ownership rights to his Corvette, he did not have access to it due to a condition imposed upon him by the Court and his ex-wife. This jury could find that Godiksen's stated belief that his ex-wife took everything from him was his true belief, based on the circumstances. This, in turn, supports a rational jury finding beyond a reasonable doubt that Godiksen had the specific intent to have his ex-wife murdered during the initial phone call.

### 4. Evidence of Godiksen's Diminished Capacity's Role in Determining his Intent.

One of Defendant's principal arguments is that a rational jury could not have found that the defendant had the requisite intent to engage in murder for hire when he spoke with D'Angelo over the phone in the initial phone call, given the nature of

the cognitive deficits he suffers. The Court disagrees. The evidence presented was sufficient that a rational jury could find beyond a reasonable doubt that the defendant had the specific intent to have his ex-wife murdered at the time of the initial conversation with D'Angelo.

At trial, Godiksen testified that he was "intoxicated" during the first phone call with D'Angelo and was generally an alcoholic. [ECF No. 147 at 196:2-12]. Defendant's witness Dr. Madelon Baranoski, a psychologist, testified that she noted in the defendant several "deficits" associated with Godiksen's "alcohol-type decline in cognitive ability." [ECF No. 147 at 79:10-11]. Dr. Baranoski reported diminished judgment and increased impulsivity, *id.* at 79:21, difficulty sequencing, *id.* at 81:3, difficulty staying on target and recalling events in organized way, *id.* at 81:4-5, difficulty putting together a plan and following through, *id.* at 79:21-22, and "confabulation," meaning that he fills in cognitive gaps with inaccurate information. *Id.* at 71:10-15.

On the other hand, Dr. Baranoski saw no signs of a psychiatric disorder or delusional thinking. *Id.* at 81:20-21. Dr. Baranoski explained that alcoholics are sometimes capable of high functioning. According to her testimony, some alcoholics can get themselves to work and conduct bank transactions. *Id.* at 107:9-19. Dr. Baranoski further testified that alcoholics can form the desire to commit a crime. *Id.* at 108:7-10. She testified that Godiksen did not receive special accommodations while in prison, *id.* at 108:11-109:3, and that there was no reason to doubt that Godiksen was competent to stand trial, understood what was going

on, and retained the ability to communicate with his attorney regarding their course of action. *Id.* at 136:6-16.

Moreover, Dr. Baranoski described Godiksen's condition as a mild impairment. *Id.* at 136:17-137:2. She further testified that even with his minor impairment, Godiksen is capable of rational thought, knows right from wrong, *id.* at 137:15-21, and can form a plan to commit a crime, although it may not be a realistic plan. *Id.* at 138:8-16. Notably, Dr. Baranoski stated that Godiksen can form the desire to commit a criminal act. *Id.* at 108:7-10; 137:22-138:7; 139:2-8. For example, she agreed that Godiksen can form the desire to rob a bank. *Id.* at 138:17-22. In sum, she testified that Godiksen had the capacity to form the intent to kill his wife but not the ability to carry out a good plan, making his decision to hire D'Angelo more credible. Moreover, the jury heard him advising D'Angelo when, where and how to murder his ex-wife further demonstrating his ability not only to harbor the intent but to compose a plan to murder.

The testimony of Dr. Baranoski, Godiksen's expert, leaves open the possibility that Godiksen's statements and actions were representative of his specific intent to have his ex-wife murdered and were not a product or manifestation of his diminished capacity as Godiksen argues. A rational jury could conclude beyond a reasonable doubt that based on Dr. Baranoski's testimony, Godiksen's statements in the initial phone call with D'Angelo were an accurate representation of Godiksen's specific intent to have his ex-wife murdered, despite his claimed alcoholism.

In addition to Dr. Baranoski's testimony, Godiksen testified that he was intoxicated when he made incriminating statements about killing his ex-wife, and that due to his intoxication he could not fully appreciate the gravity of the conversation he had with D'Angelo. [ECF No. 145 at 195:22-196:18, 197:5-6]. But the Government presented testimony of D'Angelo and Special Agent Ross ("Ross"), D'Angelo's supervising ATF case agent, that countered this argument. Both men stated that they had the proper training to detect intoxication but did not detect intoxication in Godiksen during the investigation. *See id.* at 26:4-11, 67:14-15, 111:13-22, 114:4-7]. Moreover, Godiksen does not appear intoxicated in the surveillance video post-arrest. Government Exhibits 32. A rational jury could have concluded beyond a reasonable doubt, based on the Government agents' testimony, that Godiksen was not intoxicated, and therefore intoxication was not a factor in deciding whether Godiksen had the specific intent that his ex-wife be murdered as a result of his conversation with D'Angelo.

In addition, the jury heard Godiksen's own words and was in a position to decide for themselves whether he had the mental capacity to formulate the intent to hire someone to kill his ex-wife based on the tenor as well as the content of his words. Moreover, to the extent his speech pattern was aberrant, Dr. Baranowski's explanation of the effects of alcoholism in general, and on Mr. Godiksen in particular, enabled them to formulate an informed decision as to his intent.

In sum, Dr. Baranoski's testimony, the Government agents' testimony, the circumstances surrounding Godiksen's divorce, and Godiksen's statements and the actions he took after the initial phone call with D'Angelo are such that a rational

14

jury could find beyond a reasonable doubt that Godiksen's statements during the initial phone call were an accurate representation of his specific intent to have his ex-wife murdered.

> **E.** **There was Sufficient Evidence for the Jury to Find Beyond a Reasonable Doubt that the Pecuniary Value Element of 18 U.S.C. § 1958 was Satisfied**

Actual payment for the murder-for-hire need not occur to satisfy the pecuniary value element of the murder for hire statute. *Babilonia*, 854 F.3d at 174 ("As the wording of the statute makes clear, there must be the intent that a murder be committed as 'consideration' for the payment of, <u>or promise or agreement to pay</u>, something of 'pecuniary value.'") (quoting 18 U.S.C. § 1958(a) (emphasis added)).  Thus, a promise to exchange a pecuniary value for the murder suffices to satisfy the statutory pecuniary value requirement.

Godiksen argues that the pecuniary value element is not satisfied because he bounced back and forth between different methods of paying for D'Angelo's services, and that the two therefore did not reach a mutual agreement on the murder for hire.  [ECF No. 151 at 29-31].  Godiksen cites *Hardwick*, 523 F.3d at 100, where the Second Circuit held that "[t]he promise of a future, unspecified favor— in the absence of any evidence suggesting that either party to the agreement had an understanding of what form such a favor would take—does not constitute pecuniary value under Section 1958."  Section 1958(b)(1) defines pecuniary value as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage."  18 U.S.C. § 1958(b)(1).  The question is whether there was "any

evidence" that D'Angelo and Godiksen ever reached a mutual agreement to exchange a pecuniary value for murder for hire. There was.

The evidence indicates that the promise of payment required by § 1958 could have been satisfied in the first conversation between Godiksen and D'Angelo. *See* Government Exhibit 25, 26, 30. In that initial phone conversation, D'Angelo and Godiksen loosely discussed the prospect of payment with money, but do not discuss an amount. Government Exhibit 25. Godiksen stated that he would have money put in his account in order to make funds available to pay for the job he and D'Angelo were talking about. *Id.* Godiksen then said he didn't want to keep in contact with D'Angelo unless he had the funds to pay for the murder, then reassured D'Angelo that he did in fact have the money to pay. *Id.* A rational jury could have arrived at a conclusion beyond a reasonable doubt that in this conversation the promise of future payment in monetary form was enough that the promise of a pecuniary value element was satisfied.

The face-to-face meetings between Godiksen and D'Angelo provide support for the jury's finding that the pecuniary value element of 18 U.S.C. § 1958 was satisfied. In their first face-to-face meeting, D'Angelo and Godiksen are recorded discussing a $5000 price for the murder, as proposed by D'Angelo. *See* Government Exhibit 26. Godiksen said the $5000 price was fair. *Id.* Godiksen later offered more money than the $5000, and D'Angelo declined, opting to stick with the agreed upon price. *Id.* To be sure, later in that conversation Godiksen offered his vehicle as payment for the murder, but he then reverted to the cash offer he and D'Angelo had previously discussed. *Id.* After listening to this conversation, a

rational jury could have found beyond a reasonable doubt that D'Angelo and Godiksen had confirmed the murder-for-hire scheme in return for a promise of payment of money made in their first phone call.

In his final conversation with D'Angelo, Godiksen reaffirmed that he and D'Angelo had a deal in place: murder in exchange for money. Government Exhibit 30. Godiksen was clear that the deal was not murder in exchange for his car, stating once more that he had changed his mind about offering the car. *Id.* In response to D'Angelo telling him that their conversation would be his final chance to cancel their murder for hire, Godiksen fully guaranteed his promise of payment. *Id.* The conversation D'Angelo and Godiksen had in their final encounter could lead a rational jury to conclude that there had been a formalization of the arrangement between the two parties, and that therefore a mutual agreement that the two parties would exchange money for murder was established in their first telephone call and confirmed in their last telephone call.

In sum, the conversations between Godiksen and D'Angelo could lead a rational jury to conclude beyond a reasonable doubt that there was a mutual agreement between the parties for the murder-for-hire of Godiksen's ex-wife in exchange for the promise of the payment of money. A reasonable jury could have found that the promise to pay money was agreed upon at the initial phone call between D'Angelo and Godiksen, and that although Godiksen attempted to change the terms as the conspiracy moved forward, the arrangement's agreed upon monetary payment remained unchanged.

F.    Conclusion

17

Based on the testimony presented at trial, a rational jury could have concluded beyond a reasonable doubt that the defendant used or caused D'Angelo to use a facility of interstate commerce, with the intent that his ex-wife's murder take place. A rational jury could also find beyond a reasonable doubt that the defendant promised a pecuniary value, i.e. money, in exchange for the murder-for-hire. For this reason, Godiksen's Motion for Acquittal under Rule 29 is DENIED.

## IV.    Motion for a New Trial

Separate from the Rule 29 Motion for Acquittal, Godiksen moved for a new trial, *see* Federal Rule of Criminal Procedure 33, for eight reasons. Godiksen argues that : (1) the weight of the evidence did not support the jury's verdict; (2) the Court's supplemental jury instruction regarding the definition of intent was incorrect, and therefore lowered the Government's burden of proof; (3) the Court mishandled a jury note that requested replay of Dr. Baranoski's cross-examination and rebuttal testimony; (4) the Court improperly constructively amended the indictment to permit the jury to convict on elements not alleged in the indictment; (5) the Court improperly instructed the jury that it could convict Godiksen despite their potential finding that he was 'mentally incapacitated'; (6) prosecutorial misconduct caused unfair prejudice to Godiksen; (7) the Court's denial of Godiksen's motion to suppress his post-*Miranda* statements was erroneous; and (8) the Court improperly admitted evidence of a civil order of protection existing between Godiksen and his ex-wife. [ECF No. 152 (Defendant's Motion for a New Trial) at 1].

### A.    Standard of Review

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Rule 33 "'confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'"  *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).  "When considering a motion for a new trial under Rule 33, a district court has discretion to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'"  *United States v. Truman*, 688 F.3d 129, 141 (2d Cir. 2012) (quoting *Sanchez*, 969 F.2d at 1413).  "In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (citations omitted; internal quotation marks omitted).

Despite the Court's ability to examine the entire case and weigh the evidence, "[i]n order to grant the motion [for a new trial] the reviewing court must harbor a real concern that an innocent person may have been convicted."  *Cacace*, 796 F.3d at 191 (citations omitted; internal quotation marks omitted).  "Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed . . . that discretion should be exercised sparingly."  *Sanchez*, 969 F.2d at 1414; *see also United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) ("Such authority is only exercised . . . in the

most extraordinary circumstances."). "The district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citing *Autuori*, 212 F.3d at 120). "[T]he courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, [therefore] 'it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" *Id.* at 133-34 (quoting *Sanchez*, 969 F.2d at 1414). "An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities,' although the district court's rejection of [such] trial testimony by itself does not automatically permit Rule 33 relief." *Id.* at 134 (quoting *Sanchez*, 969 F.2d at 1414).

B.      Godiksen's Conviction was not Against the Weight of the Evidence

The jury did not convict Godiksen against the weight of the evidence. On the contrary, as stated above in the Rule 29 analysis, the jury had plenty of reason to convict Godiksen of violating 18 U.S.C. § 1958 based on the evidence presented to it at trial. The jury indeed had to make some inferences regarding Godiksen's mental capacity in order to arrive at its conclusion that the intent and the pecuniary value elements of Section 1958 were satisfied, however, those inferences were easily arrived at and were not against the weight of the evidence.

At trial, as noted *supra*, Godiksen presented evidence that suggested that he was unable to form the specific intent to have his ex-wife murdered during the initial conversation with D'Angelo due to being intoxicated. Godiksen testified that

he was likely intoxicated during at least some of his other meetings with law enforcement as well, suggesting that he was unable to fully appreciate his words and actions. Godiksen also presented testimony from Dr. Baranoski that indicated that Godiksen suffered from alcoholism-related cognitive deficits. Godiksen's argument was that due to his claimed intoxication and the cognitive deficits that he suffered, it was unclear as to whether his words and actions truly represented a specific intent to have his ex-wife murdered; therefore, a jury could not find specific intent.

Godiksen also testified at trial that he believed that the investigation was a prank concocted by the inmates and corrections officers at the New Haven Correctional Center, where he was incarcerated when he asked "Josh" about finding someone he could use to murder his ex-wife; therefore, the jury could not conclude he had the requisite specific intent because he was just playing along with the prank. [ECF No. 147 at 187:16-197:24]. Godiksen did not present evidence to support this "prank" theory aside from his own testimony. The Court notes that Godiksen's standing as a credible witness was impacted on this score when he was impeached during his testimony. The Government noted in support of his motion to suppress evidence, almost a year earlier, Godiksen had signed a sworn declaration regarding his conduct during the investigation but failed to make any mention of this "prank" theory. [ECF No. 147 at 237:11-239:21].

The Government presented substantial evidence against Godiksen, including audio recordings of Godiksen soliciting murder for hire. During those recordings Godiksen affirmed his specific intent that his ex-wife be murdered and

affirmed his promise to pay D'Angelo for said murder. These affirmations were made in the form of coded language at first but were stated plainly in later conversations. The repeated affirmations indicate that throughout the investigation, the defendant had the specific intent to have his ex-wife murdered. The agents who conducted the investigation testified that they did not have any reason to believe Godiksen was intoxicated during any of their interactions with Godiksen. The defendant's witness, Dr. Baranoski, stated that Godiksen was capable forming and acting upon a desire to commit a criminal act, despite what she described as a mild impairment.

The weight of the evidence presented for specific intent supports the jury's conclusion that Godiksen had the specific intent that his ex-wife be murdered as a result of his solicitation of murder. The repeated affirmations of Godiksen's intent, the expert testimony and the lack of evidence to support intoxication during the investigation all weigh against the Defendant's contention that he did not have specific intent. There is no reason to believe the jury found that Godiksen had the specific intent that his ex-wife be murdered against the weight of the evidence.

The evidence also supports a finding that the pecuniary value element was satisfied. Godiksen was recorded during several different conversations promising payment for the murder for hire. Godiksen was heard wavering between different methods of payment, but the promise to pay with something of pecuniary value was never withdrawn. Finally, in the last conversation prior to his arrest, Godiksen emphatically promised to pay with cash for the murder. The weight of

the evidence therefore supports a finding that the pecuniary value element was satisfied.

The weight of the evidence clearly supports a finding that Godiksen used or caused another to use a facility of interstate commerce, satisfying the jurisdictional element of the statute. Godiksen stipulated to facts pertaining to this element's satisfaction and did not argue that it was left unsatisfied until this motion and the Rule 29 motion were filed. The evidence clearly weighs in favor of finding this element satisfied. Therefore, the weight of the evidence supports a jury's finding that all three elements of Section 1958 were satisfied.

C.   The Court's Supplemental Jury Instructions did not Lower the Government's Burden of Proof

Although he did not object to the supplemental jury instruction at trial, *see* [ECF No. 146 (Godiksen Trial Tr. Day 6) at 59:3-5],[1] Godiksen now asserts that the Court's supplemental jury instructions were improper because they incorrectly instructed the jury as to the definition of general intent, not specific intent, and that this had the effect of improperly lowering the Government's burden of proof. However, the original jury instructions outlined specific intent properly and the supplemental instruction did not tell the jury to disregard that earlier instruction. Given the context of the original jury instructions on specific intent, the supplemental instructions did not "mislead[] the jury as to the correct legal

---

[1] It is well-settled that "[a] A party who fails to object to a jury instruction at trial waives consideration of claims relating to that charge" unless there is "plain error." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

standard or [fail to] adequately inform the jury of the law."  *United States v. Lange*, 834 F.3d 58, 75 (2d Cir. 2016).

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citation omitted).  "Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." *Id.* (citations omitted; internal quotation marks omitted).  "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."  *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) (quoting *Naughten v. Cupp*, 476 F.2d 845, 846 (9th Cir. 1972)).  There is a "well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* at 146-47 (citing *Boyd v. United States*, 271 U.S. 104, 107 (1926)).

The supplemental jury instruction was proper considering the context that the original instruction provided.  The supplemental jury instruction that Defendant argues was improper were given in response to the Jury's request for a Webster's Dictionary definition of the term intent.  [ECF No. 146 at 63:11-16].

The specific response to the jury's request would have been to instruct the jury:

> intent noun
> in·tent | \ in-ˈtent  \
> Definition of intent (Entry 1 of 2)
> 1a : the act or fact of intending : PURPOSE
> especially : the design or purpose to commit a wrongful or criminal act
> admitted wounding him with intent
> b : the state of mind with which an act is done : VOLITION
> 2 : a usually clearly formulated or planned intention : AIM
> the director's intent
> 3a : MEANING, SIGNIFICANCE
> b : CONNOTATION sense 3
> intent adjective
> Definition of intent (Entry 2 of 2)
> 1 : directed with strained or eager attention : CONCENTRATED
> 2 : having the mind, attention, or will concentrated on something or some
> end or purpose
> intent on their work

https://www.merriam-webster.com/dictionary/intent.   The jury was not instructed on the

Webster's Dictionary definition of intent but were instead given a standard jury charge to

which both parties agreed prior to the instruction.  *Id*. at 62:16-63:1.  Those supplemental

instructions were as follows:

> Intent.  The Government must prove beyond a reasonable doubt that
> the defendant acted intentionally.  Before you can find that the
> defendant acted intentionally, you must be satisfied beyond a
> reasonable doubt, that the defendant acted deliberately and
> purposefully.  That is, the defendant's acts must have been the
> product of the defendant's conscious objective, rather than the
> product of mistake or accident.

*Id.* at 17-24. The instruction is substantially similar the requested dictionary

definition, responsive to the jury's specific request yet easier to comprehend.

Moreover, the jury's request must be read in the context in which it was made,

including the defense theory that, due to his alcoholism, Godiksen did not have the

mental capacity to formulate intent of any kind, either to perform an act of cause a

result.

The analysis does not end there because the adequacy of a jury instruction is not considered in isolation. If viewed in isolation, because this jury instruction instructs the jury as to the law for general intent, these supplemental instructions would not adequately convey the standard that the Government must meet in order to prove specific intent on the part of the defendant. However, jury instructions are viewed in light of the full context in which they are given. *See Cupp*, 414 U.S at 146-47 *(citing Boyd*, 271 U.S. at 107). Therefore, the Court's supplemental instruction must be viewed in context with the Court's limiting words in the original jury instruction regarding specific intent. In that instruction, the court advised the jury:

> [w]hat the Government must prove is that the use of the interstate facility was used with the intent to further or facilitate the commission of murder.

> You're thus being asked to look into the defendant's mind and determine the defendant's purpose in using interstate facilities and in his communications with Agent D'Angelo.

[ECF No. 146 (Jury Instructions) at 37:25, 38:1-6]. This instruction unequivocally sets forth the requirement for specific intent. Viewed in light of this original instruction, the supplemental instruction was not an impermissible lowering of the Government's burden of proof. The supplemental instruction did not state or imply that it was meant to supplant the original instruction. It gave an agreed upon answer to the jury upon request for the definition of intent, in order to assist the jury in its deliberation. Further, the jury interrogatory also stated clearly that the jury was required to determine whether Godiksen had specific intent: "We the jury unanimously find that the Government has proved beyond a reasonable doubt that the aforementioned travel or use of the interstate facility was done *with the intent*

*that a murder be committed* in violation of the laws of any State of the United States."  [Dkt. 133 (Jury Verdict) at 1] (emphasis added).  Considering the context in which the jury instructions were given, the burden of proof was not lowered below the statutory requirement by the supplemental instruction.

    **D.    The Court's Playback of Cross-Examination but Not Redirect Testimony of Dr. Baranoski was Not Improper**

Defendant argues that the Court did not follow the proper procedure in response to a jury note requesting playback of certain testimony of Defendant's witness Dr. Baranoski, and therefore unduly influenced the jury to concentrate on Dr. Baranoski's cross-examination at the expense of her redirect testimony.  "It is settled law that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds."  *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir. 1981) (citing cases); *United States v Henry*, 325 F.3d 93, 105 (2d Cir. 2003) ("In general, district courts should reveal the existence and the contents of any and all jury notes to both sides and allow counsel to suggest an appropriate response.").

> Specifically, (1) the jury's inquiry should be submitted in writing; (2) before the jury is recalled, the note should be read into the record in the presence of counsel and defendant; (3) counsel should be afforded an opportunity to suggest appropriate responses; and (4) after the jury is recalled, the request should again be read in their presence to assure that it accurately reflects their inquiry and that they all appreciate the question being asked.

*Henry*, 325 F.3d at 106.  Step two is meant to protect against "any later claim by the defendant that he remained unaware of the note's content, despite his counsel's knowledge of it."  *Ronder*, 639 F.2d at 934.  "'A violation of the defendant's rights may, under limited circumstances, constitute harmless error . . . .'"  *United States*

*v. Blackmon*, 839 F.2d 900, 915 (2d Cir. 1988) (quoting *Krische v. Smith*, 662 F.2d 177, 179 (2d Cir. 1981)).  When the jury requests to hear portions of testimony again,

> a court's response to a jury request for a readback should balance the jurors' need to review the evidence before reaching their verdict against the difficulty involved in locating the testimony to be read back, the possibility of undue emphasis on a particular portion of testimony read out of context, and the possibility of undue delay in the trial.

*United States v. Criollo*, 962 F.2d 241, 243 (2d Cir. 1992).

During the jury's deliberation in the present case, the Court received a note from the jury asking to hear a playback of the audio of "the cross and then the rebuttal."  [ECF No. 138 (Godiksen Trial Tr. Day 7) at 3:11-13; 6:21-22].  No rebuttal witness had been called.  When the jury came out to hear the replayed audio, the Court replayed the Government's cross-examination, then asked the jury if their request for playback had been satisfied.  *Id.* at 4:13-15.  The jury responded that they had heard what they had requested to hear in their note.  *Id.* at 4:16-18.  After the jury retired to the jury room, Defendant, having read the note and considered the possibilities of what the jury might have meant, voiced concern that the jury may also have been asking to hear the redirect, when they stated they'd like to hear the rebuttal.  *Id.* at 5:1-3.  The Government, also having read the jury note, stated that it assumed the jury meant redirect when it asked for rebuttal.  *Id.* at 9-11.

The Court called the jury back after these concerns were voiced by counsel, and asked "[l]adies and gentlemen, I just want to clarify that you want to hear Attorney Hayes' reexamination of Dr. Baranoski as well? Is that correct?"  *Id.* at 6:18-20.  The jury responded that the initial request was for both the cross-

examination and the redirect, but that the jury had agreed at the end of the playback of the Government's cross-examination that their request had been satisfied. *Id.* at 6:21-7:3. The Court pressed the jury for certainty on this issue twice, first asking: "[a]re you certain," and then: "I just want to make absolutely certain that you do not want to hear Attorney Hayes' reexamination—redirect examination of Dr. Baranoski." *Id.* at 7:4-17. The Court further told the jury that should they reconsider their decision they could hear that testimony, noting: "We do have that [redirect examination] available for you here, and we can play that back for you. So please let us know if you'd like that." *Id.* at 7:24-8:1. The jury responded: "[o]kay, we will—we'll retire to the deliberation room and send a note out if we'd like to follow up." *Id.* at 8:2-4. The jury later confirmed via note that it did not need to hear the playback of the redirect examination. *Id.* at 8:18-20.

The first *Henry* factor, that the jury's inquiry be submitted in writing, 325 F.3d at 106, is satisfied because the jury's inquiry was indeed submitted in writing. The fact that the Court did not initially read the note into the record as required by the second factor, *see id.*, is not error because the note was effectively read into the record when the Court discussed it with the jury, and because each party had an opportunity to review the note to see what was being asked by the jury. *See Ronder*, 639 F.2d at 934 (purpose of the second step is to preclude "any later claim by the defendant that he remained unaware of the note's content, despite his counsel's knowledge of it."). Though counsel did not have an opportunity to initially raise their concerns on the record prior to calling the jury out to answer their inquiry, counsels' concerns were heard, in the presence of the defendant,

after the playback of cross-examination after the jury departed. Those concerns were acted upon by the Court. The Court called the jury back and made sure to clarify what their request was for, and whether it had been satisfied, ensuring that defendant and counsels' concerns were properly addressed. Thus, the third *Henry* factor was satisfied. Lastly, the Court satisfied the fourth *Henry* requirement of making sure the note accurately reflected the jury's inquiry. 325 F.3d at 106. The Court did so by asking the jury to clarify what its note requested, whether that request had been satisfied, and whether the jury was certain that it did not need to hear the redirect. The Court's derivation from note handling procedure was not improper.

When specific portions of testimony are played back, and others are not, the *Criollo* factors are used to consider whether the exclusions of testimony were improper. Importantly here, the second *Criollo* factor asks a court to consider if there is a risk of undue emphasis on a particular portion of testimony if read outside of the context of the full testimony. 962 F.2d at 243. The key part of the second factor is whether the emphasis placed on the reviewed portion of the evidence is *undue*. In this case, the Court must determine whether a risk that the jury would place undue emphasis on the cross examination was created by not playing the redirect along with it.

This situation could not have resulted in undue emphasis on Dr. Baranoski's cross-examination. The redirect examination does not appear to contain any new information, as it was largely focused on reiterating the witness' credentials and elaborating on information introduced in direct and cross-examination. So, it may

be that the redirect is not what the jury was really looking for to begin with. Further, the redirect does not appear to add context to answers given in cross-examination or rebut any of the points made therein. This could explain why the jury was so sure that it did not need to hear redirect and shows that excluding it would not have placed undue emphasis on Dr. Baranoski's cross-examination.

In sum, the Court's handling of the jury note was not error. The parties had an opportunity to read the note, and their concerns were addressed. The Court's decision not to play back the redirect examination audio was based upon the ambiguity of the jury's request in the first instance, but that misinterpretation was rectified. The jury made the decision not to hear it. The Court brought the jury back into the courtroom and asked if they wanted to hear the redirect examination. To be certain, the Court asked the jury several times whether it wanted to hear the redirect as well, after it indicated that the cross-examination playback was sufficient. The jury responded verbally and via note that although it had originally wanted to hear the redirect, play back was no longer requested. Therefore, the jury indicated they heard a playback of the testimony they needed and the Court's decision not to play back the defendant's redirect examination was not error and does not require a new trial.

E.     The Court did not Constructively Amend the Indictment with its Instructions to the Jury

A constructive amendment to an indictment occurs when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (quoting *United States v. Mollica*, 849 D.2d 723, 729 (2d Cir. 1988) (emphasis in original)). "[A] constructive amendment is a *per se* violation of the Grand Jury clause." *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013). "Not every divergence from the terms of an indictment, however, qualifies as a constructive amendment. We have 'consistently permitted significant flexibility in proof adduced at trial to support a defendant's conviction, provided that the defendant was given *notice* of the *core of criminality* to be proven' against him." *United States v. Lisyansky*, 806 F.3d 706, 713 (2d Cir. 2015) (quoting *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (emphasis in original)).

> [W]hen a constructive amendment claim rests on allegedly erroneous jury instructions, a reviewing court is to consider the totality of the circumstances – including not only the instructions and the indictment but also the arguments of the parties and the evidence presented at trial – to determine whether a jury could have 'reasonably interpreted' the challenged instructions as 'license to convict' on an unindicted charge.

*United States v. Moore*, 810 F.3d 932, 936 (4th Cir. 2016) (quoting *United States v. Lentz*, 524 F.3d 501, 514-15 (4th Cir. 2008)).

The defendant argues that the court broadened the jurisdictional element of 18 U.S.C. § 1958 by including an instruction for causing another to travel in interstate commerce where the indictment only charged use of a facility of

interstate commerce and causing the use by another of a facility of interstate commerce. [ECF No. 152 at 15 ("The Court constructively amended the indictment by charging the jury on a factual and legal theory not alleged in the indictment – whether Godiksen caused the undercover agent to travel in interstate commerce.")]. The jury instructions for the first element were: "the Government must prove beyond a reasonable doubt that the defendant, at or about the time charged in the indictment, traveled or caused another to travel in interstate commerce or used or caused another to use the mail or any facility in interstate or foreign commerce." [ECF No. 146 at 35:20-36:2]. The jury interrogatory included the language "travelled or caused another to travel in interstate commerce or used or caused another to use any facility in interstate or foreign commerce," Godiksen I [Dkt. 133 (Jury Interrogatory) at 1], in the charge relating to the jurisdictional element. The indictment specifically charges that "the defendant JAMES ERIK GODIKSEN used a facility of interstate commerce, to wit a cellular telephone, and caused another to use a facility of interstate commerce, to wit a cellular telephone." [ECF No. 9 (Indictment)]. Based on the language in the indictment, the defendant argues that the Court's jury instructions regarding jurisdiction were improper.

As an initial matter, the defendant did not voice an objection to the jury instructions when they were delivered. [ECF No. 146 at 51:8-9].

Moreover, the jury did not decide this element because the Defendant conceded it. At trial, the Government and the defendant stipulated to facts relating to the use of a facility of interstate commerce. *See* [ECF No. 144 at 123:17-124:13, 125:7-9 (Stipulation stating phone calls to D'Angelo were from Godiksen's phone,

and that a cellular call from Connecticut would use cell towers in New Hampshire, Maine, Vermont, or Massachusetts to connect the call to Verizon's network)].

Moreover, the defendant conceded the jurisdictional element directly in closing: "We told you that it first happened by way of a telephone. So you hear this interstate commerce part of what needs to be proven here. We told you that. That's not a secret. We weren't hiding it." [Dkt. 149 (Godiksen Trial Tr. Day 5) at 81:15-18].

Analyzing the totality of the circumstances, as called for by *Moore*, 810 F.3d at 936, which is cited by the defendant as a key piece of their constructive amendment argument, does not indicate that a reasonable jury could arrive at the conclusion that it had a license to convict based on travel or causing travel in interstate commerce. No evidence was presented at trial that would lead a reasonable jury to conclude that it had a license to find the first element satisfied based solely on travel or causing travel in interstate commerce. There is significant evidence however, such as factual stipulations relating to that element and the defendant's above-referenced statement in closing, pointing toward the use or causing use of a facility of interstate commerce as a reasonable jury's license to find the first element satisfied. Therefore, applying *Moore* to the present case, no license to convict based on the alternate jurisdictional element of traveling or causing travel of another in interstate commerce is found. The jury simply had no occasion to do so. On the contrary, the Government and the defendant both told the jury they stipulated that the first element was satisfied based on Godiksen's

use of a facility of interstate commerce or causing D'Angelo's use of a facility of interstate commerce.

Despite the above-mentioned events at trial, the defendant further argues that because the Court did not split the interstate facility instruction from the interstate travel instruction, "we cannot know whether the jury unanimously found that Godiksen used an interstate facility or caused another to do the same." [ECF No. 152 (Defendant's Motion for a New Trial) at 16-17].

This account of the circumstance ignores the Court's specific narrowing of its intent instruction, after mentioning travel in interstate commerce, thereby limiting the jury's deliberation to whether the Government proved that the defendant used interstate facilities with the intent that murder be committed. [ECF No. 146 at 37:25-38:1-3]. In those instructions, the jury was told:

> [T]he Government must prove beyond a reasonable doubt . . . that the travel or the use of the interstate facility was done with the intent that a murder be committed in violation of the laws of any state of the United States. . . . What the Government must prove is that the use of the interstate facility was used with the intent to further or facilitate the commission of murder.
>
> You're thus being asked to look into the defendant's mind and determine the defendant's purpose in using interstate facilities and in his communications with Agent D'Angelo. You may determine the defendant's intent from the evidence that has been placed before you, including the defendant's own statements and his conduct, before and after his use of the interstate facilities.

*Id.* (emphasis added). The only interstate facility Godiksen used was a telephone. At all relevant times Godiksen was in the State of Connecticut. The jury did not hear a shred of evidence suggesting he ever left the state. . Later, the jury found that the defendant had the requisite intent with those instructions guiding its

determination.  Therefore, it is clear that the jury found that the defendant used a facility of interstate commerce as the indictment alleges, [ECF No. 9], because the jury was instructed that it was to focus its deliberation on whether the  Government proved that the defendant used a facility of interstate commerce or caused the use by another thereof, in order to find the intent element satisfied.  As such, the possible outcomes in favor of the satisfaction of the jurisdictional element, based on the instructions listed above, are that the jury found both alternate jurisdictional elements satisfied, or that only the use or causing to use a facility of interstate commerce element was satisfied.  In either scenario, the indictment's charge of using or causing the use of a facility of interstate commerce was necessary to convict Godiksen of violating Section 1958.  Therefore, no constructive amendment of the indictment occurred.

F.     The Court's Instructions to the Jury Regarding Defendant's Diminished Capacity were Not Improper

The trial was largely centered around the effect Defendant's diminished capacity may have had on his specific intent to have his ex-wife murdered. Defendant never pled insanity, nor was the insanity defense referenced during trial. Moreover, the defense expressly disavowed this defense.  Defendant argued that his mental capacity was diminished due to brain damage from alcoholism, and that he was intoxicated during the initial phone call with D'Angelo.  The Court gave two separate instructions regarding Defendant's mental capacity.  One instruction was given to instruct the jury on how to consider diminished capacity and its bearing on the jury's determination of Defendant's specific intent at the time of the initial phone call.  The second instruction was given to instruct the jury how it could

consider intoxication when determining whether Defendant had specific intent at the time of the initial phone call.

The defendant now argues that a supplemental instruction given regarding diminished capacity was incorrect, because it stated that the jury could find him guilty even if they found that he was mentally incapacitated or intoxicated. [ECF No. 152 at 22-23].

The original jury instruction regarding diminished capacity was:

> On the issue of intent, you have received evidence of the defendant's diminished capacity. Evidence has been admitted that as a result of his longstanding alcoholism, the defendant may have suffered from diminished capacity at the time the crime charged was alleged to have occurred. You may consider evidence of the defendant's diminished mental capacity in determining whether his mental capacity was, in fact, impaired, and if so, whether the Government has proven beyond a reasonable doubt that the defendant acted with the intent required to commit murder for hire.

[ECF No. 146 at 38:20-39:4]. Next, the Court gave an instruction guiding the jury on what to do if it found that Defendant was intoxicated during the initial phone call:

> If you find based upon the evidence presented that Mr. Godiksen was intoxicated when the offense was committed, you may find that Mr. Godiksen did not have the intent required for the commission of the offense as I've described to you earlier. On the other hand, even if you believe that Mr. Godiksen was intoxicated to some degree, you may still find that he was capable of, and did have the intent required to commit the crime charged.

*Id.* at 39:13-20.

Following an objection regarding the mental capacity instruction, the jury was recalled, and the Court elaborated upon this instruction by stating:

**All right, ladies and gentlemen, I just want to make absolutely certain you understand the mental capacity instruction. You are to determine whether you believe Mr. Godiksen was suffering from a diminished capacity during the period of time the crime is alleged to have occurred. And whether or not he was suffering from a diminished capacity, you must determine whether he had the intent to cause the death of his ex-wife--whether he had the intent to hire someone to murder his ex-wife.**

**You can decide he had that intent whether you decide his mental capacity was diminished or if you decide his mental capacity was not diminished. So the simple fact that his mental capacity was diminished does not necessarily mean he didn't have the intent. You have to decide both independently.**

**So you can decide that he wasn't mentally incapacitated and did have the intent, that he wasn't mentally incapacitated and he didn't have the intent, or the opposite. Okay, four possibilities. Incapacitated, didn't have the intent; incapacitated, did have the intent; not incapacitated, had the intent; not incapacitated, didn't have the intent.**

*Id.* at 52:10-53:5. This instruction did not "mislead[] the jury as to the correct legal standard or [fail to] adequately inform the jury of the law." *Lange*, 834 F.3d at 75. Despite using 'mentally incapacitated' in place of 'diminished capacity,' the charge properly laid out the facts which the jury was to find prior to returning a verdict. Defendant never pled the insanity defense, therefore the jury was not considering 'mental incapacitation' in their deliberation. Instructing the jury that it could find Defendant mentally incapacitated, yet still capable of forming intent was not error, given the trial's focus on diminished mental capacity, and the use of 'mentally incapacitated' and 'diminished capacity' interchangeably in the instruction itself.

Defendant also argues that the supplemental instruction on mental capacity improperly applied to the voluntary intoxication instruction as well. Not so. The instructions on mental capacity and voluntary intoxication were two different instructions, complete with two separately stated guidelines regarding how the jury

could consider findings of mental capacity or voluntary intoxication. The Court stated that the supplemental instruction was specifically in reference to the mental capacity instruction that preceded it and was given in order to clarify the guideline that was set forth in that original instruction. [ECF No. 146 at 52:10-12; *see also id.* at 53:3-6 (clarifying previous mental capacity instruction)]. The supplemental instruction does not reference the intoxication instruction, nor was it meant to apply to it. Defendant's argument that the Court's supplemental instruction gave the jury license to convict even if it found Defendant so intoxicated that he could not form specific intent is incorrect. Therefore, no new trial is necessary.

## G. Any Prosecutorial Misconduct, if it Occurred at All, Was Not Prejudicial

Defendant argues that the prosecutor made several statements amounting to misconduct in his closing. [ECF No. 152 at 25]. "[A] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a heavy burden . . . He must show more than that a particular summation comment was improper." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (citations omitted; internal quotation marks omitted). For the Court to grant a motion for a new trial, Defendant has the burden to show that the alleged prosecutorial misconduct, "when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial." *Id.* (citations omitted; internal quotation marks omitted). "In assessing whether a defendant has been substantially prejudiced, we consider 'the severity of the misconduct, the curative measures taken, and the certainty of conviction absent the misconduct.'" *United*

*States v. Binday*, 804 F.3d 558, 586 (2d Cir. 2015) (quoting *United States v. Rosa*, 17 F.3d 1531, 1549 (2d Cir. 1994)).

At the outset, most of the statements cited by Defendant as evidence of prosecutorial misconduct were statements that the prosecutor made in reference to factual disputes that were not yet decided by the jury, or otherwise stipulated to. For example, as stated above in the Rule 29 motion discussion, whether Defendant's ex-wife took everything from him is a factual dispute that the parties were entitled to argue their respective opinions on. Though the divorce did not result in Defendant losing his legal right to the property in question, the protective order did prevent him from accessing it. Therefore, when the prosecutor spoke about Defendant losing everything, he was speaking with at least <u>some</u> evidentiary support as to the status of Defendant's property at the time he solicited murder for hire. This statement was not evidence of misconduct because it was referencing a genuine factual dispute that is supported by at least some evidence on both sides.

The prosecutor's reference to defendant's witness as a 'hired gun' in his summation was not substantially prejudicial to the defendant. Even if the Government's reference to the defendant's witness in this way was prejudicial, it was of no consequence to Defendant because the Government soon after encouraged the jury to listen to what the witness had to say and cited to her testimony. [ECF No. 149 at 70:13-20, 129:5-9]. The Government's point in referring to Dr. Baranoski in this way appears to be that despite being called as a witness by the defense, Dr. Baranoski gave testimony that was largely supportive of the Government's case. It does not appear that the Government's goal was to

disparage the witness or defense counsel but was instead to illustrate the great weight of the Government's evidence by showing that even a witness who Defendant called to help prove his innocence gave testimony that cut against his case. Even if the prosecutor's referral to Dr. Baranoski as a hired gun were to be considered improper, it could not be considered so severe and significant as to deprive Defendant of a fair trial. *See Farhane*, 634 F.3d at 167.

Defendant also states that there is no evidence that he sought out the confidential informant when he was in jail, or that he was "shopping around" to solicit murder for hire, and that therefore the prosecutor's statements on that subject were unsupported by evidence presented at trial. [ECF No. 152 at 25]. This is fallacy. The prosecutor's statements were supported by testimonial evidence from Craig Burnett. [ECF No. 144 at 37:4-7, 55:12-23, 62:9-13 ("Q. And you mentioned earlier on cross-examination that Josh had told you that Mr. Godiksen was talking to a number of people soliciting them, a number of different people; is that what you said? A. That is correct.)]. Therefore, the Defendant's assertion that the evidence does not support the Government's claim that Godiksen was searching for hitman while in jail is incorrect.

The prosecutor stated that there was no evidence to support a finding that Godiksen was drunk at the time that he solicited murder for hire. The Defendant argues that the evidence shows "[s]lurred speech, visible intoxication, expert testimony, medical records showing severe alcohol withdrawal, etc." [ECF No. 152 at 25]. Defendant also says that "even *the prosecutor* conceded drunkenness on rebuttal." *Id.* The prosecutor's rebuttal does not concede intoxication while

Godiksen was committing the crime.  The prosecutor said that Godiksen may have been drunk hours before Godiksen and D'Angelo spoke on the phone.  But the prosecutor argued that Godiksen was not drunk at the time of the phone call, but even if he was, it was not to the extent that might cause him to lack awareness of what he was doing.  [Dkt. 149 at 64:19-21; 68:13-17; 126:14-23; 128:4-23; 129:10-25].

The evidence in favor of Godiksen's intoxication during the investigation is in large part based on his own testimony.  However, Godiksen was impeached during that testimony, [ECF No. 147 at 237:11-239:21][2], therefore it is difficult for the Court to place a great deal of weight on that evidence.  There was also evidence that Godiksen may have been suffering from withdrawal symptoms post-arrest, signaling that he may have been intoxicated at the time of the arrest, however it was in dispute as to whether Defendant had been drinking at that time or not.  The evidence against Godiksen's intoxication at the time is that the agents who conducted the investigation did not detect signs of intoxication when they with Godiksen in person or when D'Angelo spoke with him in the initial phone call.  In addition, video of Godiksen post-arrest does not show him to be intoxicated. Dr. Baranoski's  testimony of Godiksen's high tolerance for alcohol owing to his long-standing alcohol addiction also supports the conclusion that he was  not intoxicated although he may have consumed alcohol.

---

[2] In a declaration sworn to in support of his 2017 motion to suppress evidence, Godiksen said he was so chronically drunk that he could not remember his statements during his post-arrest interrogation, but at trial he said he could remember.  *Id.*

In sum, the evidence indicates that Godiksen consumed alcohol at times during the investigation, the evidence does not indicate that Godiksen was intoxicated during the various inculpating points of the investigation. Therefore, the prosecutor's assertion regarding the lack of evidence to support Godiksen having been intoxicated while committing the crime was not improper.

Defendant also argues that Prosecutor made improper appeals to the jury's common sense. Defendant states that the prosecutor committed prosecutorial misconduct when stating:

> It's also a case about accountability, how Mr. Godiksen shouldn't be allowed to say I drink a lot and it's affected me, so therefore, I couldn't have planned to kill my wife; I couldn't have done it. It is not an excuse. You should not hold it an excuse that he drinks.

[ECF No. 149 at 61:21-25].

Defendant further argues that the prosecutor mischaracterized his summation on rebuttal by stating that counsel said Defendant's diminished capacity was permanent. "The law has long recognized that summations — and particularly rebuttal summations — are not detached expositions, with every word carefully constructed . . . before the event. Precisely because such arguments frequently require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning." *Farhane*, 634 F.3d at 167 (citations omitted; internal quotation marks omitted). On rebuttal, the prosecutor said:

> He could appreciate right from wrong. He could make a plan. He could form intent to commit criminal acts, despite his impairments. Most importantly, listen to that diminished capacity defense. Really analyze it using just your common sense. What are they saying? Remember counsel kept saying he has this permanent impairment? Does that mean that Erik Godiksen can never ever from now on

> commit a crime?  He has a permanent impairment.  He could do whatever he wants.  Is that what they're asking you to do?

[ECF No. 149 at 129:10-19].  The prosecutor's statement here was in response to defense counsel's statements in closing, which stated that Godiksen's impairment was permanent.  *Id.* at 103:12-13, 109:22, 111:13-15.  Defense counsel stated:

> Intent--an intent through someone who's impaired--was these cognitive deficits permanent.  Executive functioning, permanent damage.  Someone who drinks--all he wanted to do was satiate himself with alcohol.  Who cares about food?  Sugar in your milk, who cares about that?  Who needs dessert now?  All I need is my bottle of Dubra.  What did he say, bottom shelf?  That's all I need.

*Id.* at 111:13-19.  As the Government pointed out, Dr. Baranoski never stated that Defendant's impairment was permanent.  [ECF No. 147 at 79:14-15].  Nonetheless, Defendant stated that the impairment was permanent and due to that damage and his supposed intoxication, he could not fully appreciate the severity of the situation he found himself in.  Based on these statements by defense counsel, the prosecutor reasoned that defense counsel was arguing that Defendant could not have ever formed specific intent, in part due to defense counsel stating that the impairment was permanent.  [ECF No. 152 at 62-63]. "The government is afforded some latitude in responding to arguments made by the defense."  *United States v. Aquart*, 912 F.3d 1, 28 (2d Cir. 2018).   The prosecutor's inference was not unreasonable, because defense counsel talked about the Defendant's alcoholism in the same context as his statements regarding Defendant's specific intent.  The prosecutor's question to the jury was fair to ask, in response to an implication made by defense counsel regarding the effect of Defendant's alleged intoxication and his impairment on the question of specific intent.

Further, the Court's jury instructions would have cured any risk of a deprivation of a fair trial that arose from the prosecutor's statement. The mental capacity and intoxication instructions informed the jury that it could find that if Defendant was intoxicated, and/or had diminished capacity, a reasonable jury could find beyond a reasonable doubt that Defendant either did or did not have the requisite intent.

The Defendant also contends that the prosecutor made appeals to the jury to convict based on sympathy for law enforcement in the Government's rebuttal summation. [ECF No. 152 at 27]:

> Ask yourselves: What was the ATF supposed to do? The way counsel argued it, they were supposed to wait. They were supposed to wait until they had a dead body on their hands, and now we can go and try to solve the crime.
>
> Ask yourselves: Is that what we want our law enforcement to do, wait until there's a dead body? Or should they make that call? Should they do what they're supposed to do -- do what law enforcement is supposed to do and enforce the laws and stop crime.

[ECF No. 149 at 124:12-21]. However, Defendant fails to consider the context in which these statements were made by Prosecutor. Defendant challenged the Government's contention that Godiksen was serious about soliciting murder for hire, prior to the Government reaching out to him: "The fact is, had they never called Dugan, Mr. Godiksen, none of us would be here. He was never going to call them. He didn't have a number to call. He didn't know who to call. He didn't know what to do. He wasn't looking to do this." *Id.* at 84:20-24. Defendant essentially argued to the jury that this situation was created not by Godiksen, but by the Government characterizing Godiksen's harmless bluster as a serious intention to

have his wife murdered.  The prosecutor's statements in the rebuttal summation were in direct response to what defense counsel said in its own summation.  The prosecutor's statements were meant to demonstrate the severity of Godiksen's words and actions, and to illustrate ATF's options in such a situation where they had intelligence suggesting an innocent life was at risk.  ATF was forced by the confidential informant's report to decide between acting preemptively to stop a violent crime, or to wait and see what would transpire.  The Government was well within its right to rebut defense counsel's assertion that the Government's decision to conduct the investigation was the determining factor in Godiksen's solicitation of murder for hire.  These statements do not amount to prosecutorial misconduct because they are not improper.

Defense counsel also suggests that the prosecutor's mention of the protection order at the end of summation was improper.  Defense counsel took issue with the statement: "Don't convict him because of an order of protection.  That's not the reason to convict him."  [ECF No. 149 at 130:10-12].  After this remark, the prosecutor continued: "Convict him because he hired someone to kill his wife, because he's responsible for it.  Hold him accountable for that act . . ."  *Id.* at 12-13.  The prosecutor was steering the jury away from improper motives to convict the Defendant here.  The prosecutor acknowledged that evidence of the protection order was admitted as evidence but cautioned the jury, stating that the protection order was not the issue they are deliberating.  The prosecutor told the jury that they should focus their deliberation on whether the Defendant committed murder for hire.  This statement was neither improper, nor prejudicial.

The Government did make a questionable inference regarding <u>why</u> Defendant went to jail. However, defense counsel did not object to this statement. Further, this single inference was not "so severe and significant as to have substantially prejudiced [Defendant], depriving [Defendant] of a fair trial." *Farhane*, 634 F.3d at 167 (citations omitted; internal quotation marks omitted).

The prosecutor stated that Defendant "went to jail to find a hitman." [ECF No. 149 at 61:17]. There is no evidence to suggest that Godiksen went to jail in order to find a hitman to kill his ex-wife, other than his conduct while in jail. The evidence of his conduct once in jail is too strained to suggest that he got himself sent there specifically to find a hitman. The Government argues that Godiksen's lack of knowledge of a hitman at the Madison Beach Club and Godiksen's friend's lack of knowledge of a hitman is evidence that he went to jail to find a hitman. [ECF No. 153 at 56]. This interpretation of the facts is too significant a stretch to justify a statement that Godiksen went to jail to find a hitman. The evidence suggests that once in jail, Godiksen sought out a hitman to carry out murder for hire, but the evidence does not justify a statement that Godiksen actually went to jail to find one. Despite this stretched interpretation of Godiksen's in-jail conduct, the prosecutor's statement did not deprive Godiksen of a fair trial. This statement merely bolsters an independently strong claim by the Government that Godiksen was shopping around for a hitman while in jail, and thereby had the intent to solicit murder for hire at that time. Though this statement may have been improper, it was not objected to and did not deprive Defendant of a fair trial. *See Farhane*, 634 F.3d at 167.

In sum, the prosecutor's comments in closing and in rebuttal were either proper, or, if improper, did not deprive Defendant of a fair trial.

**H. The Court Did Not Err in Admitting Evidence of Godiksen's Post-*Miranda* Statements and The Protective Order Between Godiksen and his Ex-Wife**

The Court did not err in denying Defendant's motion to suppress his post-*Miranda* statements. Defendant argued that he was so intoxicated at the time of his arrest that he could not have waived his *Miranda* rights. The Court denied Defendant's motion to suppress these statements because Defendant was asking relevant questions during the post-arrest interrogation and attempting to bargain for his release, demonstrating that he was not so intoxicated that he could not waive his *Miranda* rights. *See* Government Exhibit 32. On the contrary, his attempt to cajole and negotiate with the officers demonstrated not only his awareness of his predicament but his ability to formulate and execute a defense strategy. During the Motion to Suppress proceedings, Defendant brought forth witnesses who testified to his alcoholism. [ECF No. 98 (Motion to Suppress Hearing, Day 2) at 22:2-21 (Defendant's brother testified to finding alcohol in Defendant's car post-arrest)]; *id.* at 14:7-20 (Defendant's sister testifies to finding bottles of alcohol in Defendant's car while cleaning it out post-arrest).

However, in its denial of Godiksen's Motion to Suppress the post-*Miranda* statements, the Court stated:

> While the Court recognizes that Mr. Godiksen has a drinking problem, certainly cannot say that everyone who has a drinking problem, everyone who drinks to excess or every alcoholic is incapable of providing consent and waiving their Miranda rights. The Court has reviewed the most telling evidence here and that is the videotape of

the interrogation. And it is patently clear in that video that Mr. Godiksen had his wits about him. He was asking relevant questions. He indicated his understanding of the seriousness of the matter and indicated his understanding of the consequences of the matter, and he attempted to negotiate his release with the officers.

That conduct and those statements are not the statements of a person who is so inebriated that he cannot give consent, that he cannot waive his rights.

The motion to suppress is denied.

[ECF No. 98 at 38:13-39:9]. For the same reasons articulated by the Court at the Motion to Suppress hearing, the Court again finds that Godiksen's Post-*Miranda* statements were properly admitted.

The Defendant also argues that the admission of the post-*Miranda* statements forced his hand in withdrawing the motion to suppress and thereby admitting the pre-*Miranda* statements, in order to provide context for the already admitted post-*Miranda* statements. As stated above, in both the pre-*Miranda* and post-*Miranda* statements, Defendant appeared coherent and asked relevant questions. *See* Government Exhibit 32; *see also* [ECF No. 145 at 129:18-25 (At trial, the entire video, pre and post-*Miranda*, was admitted as Government Exhibit 32 and shown to the jury)]. This conduct indicated that Defendant was not <u>so</u> intoxicated that he could not waive his *Miranda* rights. Furthermore, Defendant and defense counsel both were consulted on the matter, and Defendant was questioned by the Court extensively to ensure that he knew what he was agreeing to. [ECF No. 145 at 122:14-125:4]. Only after being apprised of those rights by the Court, were the pre-*Miranda* statements admitted. *Id.* at 125:5-6.

Defendant further argues that the agents deliberately violated *Miranda* by not pursuing a *Miranda* waiver soon enough and the post-*Miranda* statements should

not have been admitted because of this delay. Defendant says there has not been a legitimate explanation for why the *Miranda* warning was not conducted in a timely manner. However, it was the Defendant who repeatedly interrupted the agents' administration of his *Miranda* rights. Despite the agent's protestations and advice, Godiksen repeatedly asked the agent questions and made unprompted statements of his own. *See* Government Exhibit 32. Defendant interrupted and asked why the agent had to read the *Miranda* rights to him, when he had just read them to himself. *See* Government Exhibit 32. Defendant continued to speak and ask questions to the agents during their attempt to Mirandize him, including asking whether he should call a lawyer and asking what he had done wrong. *See id*. The agents declined to answer these questions until the *Miranda* rights were read. *See id*. Finally, after more than one attempt to Mirandize Defendant, he was finally read his rights and signed the form, acknowledging that he understood his rights. *See id.* In sum, the Court did not err in admitting Defendant's post-*Miranda* statements.

The Defendant also challenges the introduction of the protective order between Defendant and his ex-wife as evidence. Defendant did not object to its introduction. [ECF No. 145 at 93:17]. Defendant had advance notice that the Government would seek to introduce it, because the Government stated that it planned to introduce the evidence in its pre-trial memorandum. [ECF No. 92 (Trial Memo) at 4]. The protective order that existed between Defendant and his ex-wife is relevant to Defendant's motive to solicit murder for hire and is not unfairly prejudicial.

The protective order was admitted because it clarifies Defendant's motive to have his wife killed. Rule 404(b)(2) states that "evidence may be admissible for another purpose [other than character evidence], such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Here, although the protective order might be construed as character evidence, it was clearly used by the Government to establish motive. The Government even advised the jury to avoid using this evidence for the wrong purposes. [ECF No. 149 at 130:9-12 ("[T]here's been some evidence here about orders for protection. Don't convict him because of an order of protection. That's not the reason to convict him.")]. As stated in the above Rule 29 decision, Godiksen believed his wife had taken everything from him in the divorce, due in part to his inability to go retrieve his property from his ex-wife's home. Though some of that property remained in his name after the divorce, Godiksen's stated motive to have his ex-wife murdered was that she had taken everything from him. The protection order is an explanation for why Defendant felt that his ex-wife had taken everything from him after the divorce, despite his having retained some non-possessory interest in several items in the divorce. Without evidence of the protection order, the Defendant's belief that his ex-wife had taken everything from him would not make sense. The protection order is therefore highly relevant to the Government's case against Defendant, and highly probative of Defendant's motive to solicit his ex-wife's murder.

Defendant states that the prosecutor said he would not introduce the evidence unless the Defendant "opened the door" first. Although Defendant claims

he did not open the door to evidence of the protection order, he in fact argued that his ex-wife had not taken everything from him in the divorce. Defendant discussed the terms of his divorce from his ex-wife in order to argue that his own statements did not match the facts and should therefore not be taken seriously. For the Government to explain this factual discrepancy, the protective order was necessary. It provides an explanation for how Godiksen could feel his wife had taken everything from him, despite the relatively equal terms of the divorce. When Defendant rebutted his own statements by stating that they did not make sense in the context of the terms of the divorce, the Government introduced the protective order to show why that belief was not as far-fetched as it may have sounded.

In sum, neither the Court's admitting of post-*Miranda* statements by the Defendant nor the Court's admitting the protection order was improper.

## V. Conclusion

The defendant has not shown that the evidence presented at trial was so insufficient that no rational jury could find him guilty beyond a reasonable doubt of violating 18 U.S.C. § 1958. Further, the defendant has not shown why he should be granted a new trial. The defendant's motions for acquittal, [ECF No. 151], and for a new trial, [ECF No. 152], are DENIED.

IT IS SO ORDERED.

*Vanessa Lynne Bryant*  Vanessa Bryant
2019.07.30 18:23:53 -04'00'
**Hon. Vanessa L. Bryant**

United States District Judge

**Dated at Hartford, Connecticut: July 30, 2019.**